UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KATHLEEN FITZGERALD, On Behalf of Herself and All Others Similarly Situated, | : : : | Civ. No._____ |
| Plaintiffs, | : : | CLASS ACTION |
| vs. | : : : | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| CITIGROUP INC., CITIGROUP GLOBAL MARKETS INC., SALOMON SMITH BARNEY INC., SMITH BARNEY FUND MANAGEMENT LLC; SMITH BARNEY ASSET MANAGEMENT; CANARY CAPITAL PARTNERS, LLC; CANARY INVESTMENT MANAGEMENT, LLC; CANARY CAPITAL PARTNERS, LTD, and JOHN DOES 1-100, | : : : : : : : : : : | DEMAND FOR JURY TRIAL |
| Defendants. | : : | |

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings as well as other regulatory filings and reports and advisories about the mutual funds set forth in Exhibit A annexed hereto (collectively referred to as the "Funds" or the "SSB Funds"), interviews with witnesses and confidential informants, press releases, and media reports about the Funds. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired or hold shares or other ownership units of one or more of the Funds between January 1, 1999 and July 1, 2003, inclusive, and who were

damaged thereby (the "Class").  Plaintiff seeks to pursue remedies under the Securities Act of

1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act") and the

Investment Advisers Act of 1940 (the "Investment Advisers Act"), as well as certain common

law causes of action as enumerated below.

2.      This action charges defendants with engaging in an unlawful and deceitful course

of conduct designed to improperly financially advantage defendants to the detriment of plaintiffs

and the other members of the Class.  The Advisor Defendants, as defined below, in clear

contravention of their fiduciary responsibilities, and disclosure obligations, failed to properly

disclose that select favored customers were improperly allowed to "time" their mutual fund

trades.  Such timing, as more fully described herein, improperly allowed an investor to trade in

and out of a mutual fund to exploit short-term moves and inefficiencies in the manner in which

the mutual funds price their shares.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to § 27

of the Exchange Act of 1934 (15 U.S.C. § 78aa); Section 22 of the Securities Act (15 U.S.C.

§ 77v); Section 80b-14 of the Investment Advisers Act (15 U.S.C.§ 80b-14); and 28 U.S.C.

§§ 1331, 1337.

4.      Many of the acts charged herein, including the preparation and dissemination of

materially false and misleading information, occurred in substantial part in this District.

Defendants conducted other substantial business within this District and many Class members

reside within this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## **PARTIES**

6.      Plaintiff Kathleen Fitzgerald ("Fitzgerald") , as set forth in her certification, which is attached hereto and incorporated by reference herein, purchased shares or units in the following mutual funds: Smith Barney High Income Fund, Smith Barney Aggressive Growth Fund B, Smith Barney Diversified Strategic Income Fund, and Smith Barney Diversified Strategic Income Fund.  Fitzgerald purchased these shares or units during the Class Period and has been damaged thereby.

7.      Defendant Citigroup Inc. ("Citigroup") is a Delaware corporation which maintains its principal place of business and corporate headquarters at 399 Park Avenue, New York, New York 10043.  Citigroup describes itself as a diversified global financial services holding company whose businesses provide a broad range of financial services to consumer and corporate customers, with some 200 million customer accounts doing business in more than 100 countries.  Citigroup is organized into five business groups: the Global Consumer Group, Global Corporate & Investment Banking Group, Global Investment Management, Smith Barney (Private Client Services), and Citigroup International.

8.      Defendant Citigroup Global Markets Inc. ("CGM") is a wholly owned subsidiary of Citigroup and holds Citigroup's diverse asset management businesses.  At all relevant times, CGM (or its predecessor companies) has served as the distributor for the Smith Barney Funds. CGM maintains its principal place of business at 399 Park Avenue, New York, New York 10043.

9.     Defendant Salomon Smith Barney Inc. ("Smith Barney") is a division of CGM and a wholly owned subsidiary of Citigroup.  Smith Barney describes itself as the global private wealth management and equity research unit of Citigroup and a leading provider of comprehensive financial planning and advisory services to high net-worth investors, institutions, corporations and private businesses, governments and foundations.  Smith Barney claims that it currently serves more than 7.5 million client accounts representing nearly $900 billion in client assets.  Smith Barney maintains its principal place of business at 399 Park Avenue, New York, New York 10043.

10.     Defendant Smith Barney Fund Management LLC ("SBFM") is an affiliate of both CGM and Smith Barney and a wholly owned subsidiary of Citigroup.  At all relevant times, SBFM (or its predecessor companies) served as the investment adviser and administrator for the Funds.  SBFM is a Delaware limited liability company and maintains offices at 399 Park Avenue, New York, New York 10043.

11.     Defendant Smith Barney Asset Management ("SBAM") is a division of CGM. Shares of the Smith Barney Funds are sold to the investing public primarily through affiliates of SBAM and its network of Smith Barney Brokers.  SBAM maintains offices at 399 Park Avenue, New York, New York 10043.

12.     Each of the defendants named in paragraphs "7" through "11" above are referred to herein individually or collectively as the "SSB Adviser Defendants" or the "Advisor Defendants."

13.     At all relevant times, the SSB Advisor Defendants controlled the contents of and were responsible for the accuracy and completeness of the Prospectuses for the SSB Funds, and

controlled and were responsible for the sales practices of Smith Barney Brokers in connection with the sale of shares of the SSB Funds.

14.     Defendant Canary Capital Partners, LLC is a limited liability company organized and existing under the laws of the State of New Jersey, with offices at 400 Plaza Drive, Secaucus, New Jersey.

15.     Defendant Canary Investment Management, LLC is a limited liability company organized and existing under the laws of the State of New Jersey, with offices at 400 Plaza Drive, Secaucus, New Jersey.

16.     Defendant Canary Capital Partners, Ltd., is a Bermuda limited liability company. Canary Capital Partners, Ltd., was an active participant in the unlawful scheme alleged herein.

17.     Defendants Canary Capital Partners, LLC; Canary Capital Partners, Ltd.; and Canary Investment Management, LLC; are collectively referred to herein as the "Canary Defendants" or "Canary."

18.     The true names and capacities of defendants sued herein as John Does 1 through 100 are other active participants with the Advisor Defendants in the widespread unlawful conduct alleged herein whose identities have yet to be ascertained.  Such defendants were secretly permitted to engage in improper timing at the expense of ordinary SSB Funds investors, such as plaintiff and the other members of the Class, in exchange for which these John Doe defendants provided remuneration to the Advisor Defendants.  Plaintiffs will seek to amend this complaint to state the true names and capacities of said defendants when they have been ascertained.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who purchased or otherwise acquired or hold shares of the Funds or like interests in the Funds, between January 1, 1999 and July 1, 2003, inclusive, and who were damaged thereby.  Plaintiff and each of the Class members purchased shares or other ownership units in the Funds pursuant to a registration statement and prospectus.  The registration statement and prospectus pursuant to which plaintiffs purchased their shares or ownership units in the Funds are referred to herein collectively as the "Prospectuses" or "Funds' Prospectuses."  Excluded from the Class are defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Funds and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

21.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by defendants' acts as alleged herein;

b.      whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and financial statements of the Funds; and

c.      to what extent the members of the Class have sustained damages and the proper measure of damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## <u>SUBSTANTIVE ALLEGATIONS</u>

25.     From January 1, 1999 to July 1, 2003, with the active assistance of the SSB Adviser Defendants, the Canary Defendants engaged in a fraudulent scheme to reap tens of millions of dollars at the expense of Plaintiff, the Class and the nominal defendant Funds.  The scheme involved the complicity of the Adviser Defendants that violated their fiduciary duties to their beneficiaries in return for substantial fees and other income for themselves and their affiliates.

26.     The scheme involved "timing" of mutual funds. "Timing" is an investment technique involving short-term, "in and out" trading of mutual fund shares. The technique is designed to exploit inefficiencies in the way mutual fund companies price their shares. This practice is by no means limited to Canary.  Indeed: (1) it is widely acknowledged that timing inures to the detriment of long-term shareholders by diluting their interests in the fund; (2) because of this detrimental effect, mutual fund prospectuses typically state that timing is monitored and the funds work to prevent it; and (3) nonetheless, in return for investments that will increase fund managers' fees, fund managers enter into undisclosed agreements to allow timing.

27.     In fact, certain mutual fund companies have employees (generally referred to as the "timing police") who are supposed to ferret out "timers" and put a stop to their short-term trading activity.  Nonetheless, the SSB Advisor Defendants arranged to give Canary and other market timers the ability to time the SSB Funds, to the detriment of the other fund investors, in return for substantial fees generated as a result of the timing activity, as well as other financial incentives.

28.     The Fund's prospectuses created the impression that the Funds were vigilantly protecting investors against the negative effects of timing.  In fact, the opposite was true: managers sold the right to time their funds to Canary and other hedge fund investors.  The SSB Adviser Defendants willingness to negotiate away rules put in place to protect mutual fund investors in return for increased management fees constituted a blatant violation of the Adviser Defendants' fiduciary duties to Plaintiffs and Class, as well as a breach of the terms of the prospectus, which governed the operation and management of the Funds.

**The Mutual Fund Scandal Breaks**

29.     On September 4, 2003, *The Wall Street Journal* reported that the New York

Attorney General Elliot Spitzer filed a complaint in New York Supreme Court alleging that

certain mutual fund companies secretly allowed, and in some instances facilitated Canary Capital

Partners, LLC, a New Jersey based hedge fund to engage in prohibited trading in mutual fund

shares.  (the "Spitzer Complaint").  In return for receiving this favored treatment, which

damaged the long term mutual fund investors, Canary parked funds in financial instruments

controlled by the fund companies or their affiliates to increase fund management fees, and

entered into other arrangements which benefited the fund companies and/or their affiliates.  The

article reported as follows regarding the matter:

> Edward Stern . . . finds himself at the center of a sweeping investigation into the
> mutual fund industry after paying $40 million to settle charges of illegal trading
> made by the New York State Attorney General's Office.  According to the
> settlement, Mr. Stern's hedge fund, called Canary Capital Partners LLC, allegedly
> obtained special trading opportunities with leading mutual fund families including
> Bank of America Corp's Federated Funds, Bank One Corp., Janus Capital Group
> Inc. and Strong Financial Corp.   by promising to make substantial investments in
> various funds managed by these institutions.

However, Canary's timing activities were by no means limited to the mutual funds identified in

the Spitzer Complaint.  Rather, the article indicated that the practices enumerated in the Spitzer

Complaint were just the tip of the iceberg, stating as follows:

> In a statement, Mr. Spitzer said "the full extent of this complicated fraud is not yet
> known," but he asserted that "the mutual fund industry operates on a double
> standard" in which certain traders "have been given the opportunity to manipulate
> the system.  They make illegal after hours trades and improperly exploit market
> swings in ways that harm ordinary long term investors."

30.     The Spitzer Complaint received substantial press coverage and sparked additional

investigations by state agencies, the SEC and U.S. Attorney for the Southern District of New

York, and led to calls for more regulation and tougher enforcement of the mutual and hedge fund

industries.  On September 5, 2003, The Wall Street Journal reported that the New York Attorney

General's Office had subpoenaed "a large number of hedge funds" and mutual funds as part of

its investigation, "underscoring concern among investors that the improper trading of mutual

fund shares could be widespread" and that the SEC, joining the investigation, plans to send

letters to mutual funds holding about 75% of assets under management in the U.S. to inquire

about their practices with respect to market timing and fund trading practices.

**The Detrimental Effect of Market Timing and Late Trading on Long Term Sharholders**

31.     Mutual funds are meant to be long-term investments. They are designed for buy-

and-hold investors, and are therefore the favored homes for Americans' retirement and college

savings accounts. Nevertheless, quick-turnaround traders routinely try to trade in and out of

certain mutual funds in order to exploit inefficiencies in the way the funds set their Net Asset

Values ("NAV").  This trading strategy is known as market timing.

32.     This strategy works only because some funds use "stale" prices to calculate the

value of securities held in the fund's portfolio. These prices are "stale" because they do not

necessarily reflect the "fair value" of such securities as of the time the NAV is calculated. A

typical example is a U.S. mutual fund that holds Japanese shares. Because of the time zone

difference, the Japanese market may close at 2:00 a.m. New York time. If the U.S. mutual fund

manager uses the closing prices of the Japanese shares in his or her fund to arrive at an NAV at

4:00 p.m. in New York, he or she is relying on market information that is fourteen hours old. If

there have been positive market moves during the New York trading day that will cause the

Japanese market to rise when it later opens, the stale Japanese prices will not reflect them, and

the fund's NAV will be artificially low. Put another way, the NAV does not reflect the true

current market value of the stocks the fund holds. On such a day, a trader who buys the Japanese

fund at the "stale" price is virtually assured of a profit that can be realized the next day by

selling. This and similar strategies are known as "time zone arbitrage." Taking advantage of this kind of short-term arbitrage repeatedly in a single mutual fund is called "timing" the fund.[1]

33.     A similar type of timing is possible in mutual funds that contain illiquid securities such as high-yield bonds or small capitalization stocks. Here, the fact that some of the fund's securities may not have traded for hours before the New York closing time can render the fund's NAV stale, and thus open it to being timed. This is sometimes known as "liquidity arbitrage."

34.     Effective timing captures an arbitrage profit, which comes dollar-for-dollar out of the pockets of the long-term investors: the timer steps in at the last moment and takes part of the buy-and-hold investors' upside when the market goes up, so the next day's NAV is reduced for those who are still in the fund. If the timer sells short on bad days—as Canary did—the arbitrage has the effect of making the next day's NAV lower than it would otherwise have been, thus magnifying the losses that investors are experiencing in a declining market.

---

[1]     A particularly striking historical example of time zone arbitrage is described in a June 10, 2000 article in TheStreet.Com entitled "Your International Fund May Have the 'Arbs Welcome' Sign Out" :

On Oct. 28, 1997, on the heels of a 10% decline in the U.S. stock market, Asian markets dropped precipitously. By 4 p.m. ET, however, the U.S. markets had recovered. To anyone following the Asian markets, it was clear that those markets would follow suit when they opened for trading.

Unfortunately, this was not so clear to some mutual funds that invest in securities traded in Asian markets. These funds calculated their NAVs at the lower, 13 hours' stale closing prices on the exchange. Many arbitragers, knowing the funds' next-day NAV would rise, stood ready to exploit this pricing discrepancy.

. . . They poured money into Asia/Pacific funds and sold them the next day, pocketing a one-day profit of around 10%. This profit came directly out of the pockets of the remaining shareholders.

How much did shareholders in Asia-Pacific funds lose because the funds used stale prices to value their portfolios? Not surprisingly, the funds aren't talking. But based on methodology suggested by the SEC, shareholders in many of these funds would have seen their accounts drop by up to 2.5% overnight.  See also "International Funds Still Sitting Ducks for Arbs," TheStreet.com (July 1, 2000).

35.     The wealth transfer of arbitrage based on the timing of mutual fund transactions has numerous deleterious effects on investors in mutual funds.  First and foremost, investors in the Funds were damaged by virtue of the dilution of the Funds assets that is caused by market timed transactions.  Simply put, but for the market timed transactions, the NAV of the Funds would be higher.  In addition "timed" transactions lead to greater transaction costs which must be borne by long-term investors. Indeed, trades necessitated by timer redemptions can also lead to realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market.

36.     Mutual fund managers are aware of the damaging effect that timers have on their funds. And while the effects on individual shareholders may be small once they are spread out over all the investors in a fund, their aggregate impact is not: for example, one recent study estimates that U.S. mutual funds lose $4 billion each year to timers. Eric Zitzewitz, Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds (October 2002) 35, at http://faculty-gsb.stanford.edu/zitzewitz/Research/arbitrage1002.pdf. While it is virtually impossible for fund managers to identify every timing trade, large movements in and out of funds—like those made by Canary—are easy for managers to spot. And mutual fund managers have tools to fight back against timers.

37.     Fund managers typically have the power simply to reject timers' purchases. Many funds have also instituted short-term trading fees ("early redemption fees") that effectively wipe out the arbitrage that timers exploit. Generally, these fees go directly into the affected fund to reimburse it for the costs of short term trading. In addition, fund managers are required to update NAVs at the end of the day in New York when there have been market moves that might render the NAV stale. This is called giving the fund a "fair value." It eliminates the timer's arbitrage. As

fiduciaries for their investors, mutual fund managers are obliged to do their best to use these weapons to protect their customers from the dilution that timing causes.

38.     Given the harm that timing causes, and the tools available to put a stop to it, why would a mutual fund manager allow his fund to be timed? The answer lies in the way that mutual funds are organized. Typically a single management company sets up a number of mutual funds to form a family. For example, the SSB Advisor Defendants are the managers for the SSB Funds. While each mutual fund is in fact its own company, as a practical matter the management company runs it. The portfolio managers who make the investment decisions for the funds and the executives to whom they report are all typically employees of the management company, not the mutual funds themselves. Still, the management company owes fiduciary duties to each fund and each investor.

39.     The management company makes its profit from fees it charges the funds for financial advice and other services. These fees are typically a percentage of the assets in the fund, so the more assets in the family of funds, the more money the manager makes. The timer understands this perfectly, and frequently offers the investment adviser more assets in exchange for the right to time trades.  The Adviser Defendants all succumbed to temptation and allowed the Canary Defendants and other preferred investors to enter into timed transactions, selling out their beneficiaries, so that these preferred investors could achieve a greater profit than the ordinary buy-and-hold investor and so that they could line their pockets with greater management fees.

40.     As an additional inducement for allowing the timing, investment advisers often received "sticky assets." These were typically long-term investments made not in the mutual fund in which the timing activity was permitted, but in one of the investment advisers' other

financial vehicles (e.g., a bond fund or a hedge fund run by the manager) that assured a steady flow of fees to the adviser.

41.     In addition to being an obvious violation of their fiduciary duties to Plaintiff and the Class, the Adviser Defendants were aware of the detrimental effect that timing had on the performance of a fund and assured investors that they monitored and protected against such activities.  For example, in the section termed "Excessive exchange transactions" in the December 27, 2002 prospectus for the Smith Barney Aggressive Growth Fund, it states:

> The manager may determine that a pattern of frequent exchanges is detrimental to the fund's performance and other shareholders.  If so, the fund may limit additional purchases and/or exchanges by the shareholder.

This language is repeated throughout the prospectuses' for the various SSB funds.

**Solomon Smith Barney Defendants**

42.     During the relevant period, the SSB Advisor Defendants allowed and facilitated timing in order to earn excessive fees resulting from increased cash deposited by timers.  In addition, SSB Advisor Defendants collected additional fees, called wrap fees, from timers in exchange for permitting timing.  Upon information and belief, SSB was well known in the mutual fund industry for its extensive timing practices.

43.     For example, during the relevant period, William Muldoon, an employee in SSB's New York Office, worked with Canary to facilitate timing in SSB's Aggressive Growth Fund.  Also during the relevant period, Tom Wilson and Matt Curly, employees in SSB's Chicago Office, worked with Canary Capital to facilitate market timing in SSB's variable annuities.  Variable annuities and mutual funds offered a lot of capacity for timers, and SSB's Chicago Office specifically marketed its annuities to timers.  Plaintiff, and other members of the Class, who purchased shares of these funds during the relevant period were damaged thereby.

44.     Plaintiff believes and alleged thereon that SSB entered into these, as well as other arrangements with other preferred investors, in order to allow these preferred investors to both execute "timed" transactions as well as engage in improper late trading of other SSB Funds.

45.     SSB brokers persuaded unknowing class members, including plaintiff, to invest in funds subject to late trading and market timing without disclosing such facts.

46.     The arrangements with these additional investors, like the arrangements with the Canary Defendants, caused significant damage to the Funds as well as Plaintiffs and the Class as a result of, among other things, the dilutive effect such improper transactions had on shares in the Funds.

## <u>RELIANCE</u>

47.     All Funds were sold by stockbrokers and employees of the Advisor Defendants and/or their affiliates, who were charged with reading the Funds' prospectuses and explaining the same to investors.  Plaintiff Fitzgerald's stockbroker read the Prospectuses for the Funds she purchased, and in turn explained them to Plaintiff and recommended that Plaintiff purchase the Funds listed on her attached certification.  Plaintiff and other members of the Class would not have purchased the Funds if the Prospectuses had adequate disclosures concerning the Defendants' practices of allowing and facilitating timing in order to earn excessive fees and collect wrap fees.  Plaintiff and other members of the Class relied on Defendants' explanations and disclosures when they purchased the Funds.

## VIOLATIONS OF THE SECURITIES ACT

### FIRST CLAIM FOR RELIEF

### Against the Funds for Violations
### of Section 11 Of The Securities Act

48.     Plaintiff repeats and realleges each and every allegation contained above as if fully set fort herein, except that, for purposes of this claim, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct and otherwise incorporates the allegations contained above.

49.     This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the plaintiff and other members of the Class against the Funds.

50.     Defendants filed registration statements under the Securities Act of 1933 pursuant to which they sold shares of the Funds to plaintiffs and the other members of the Class and are statutorily liable under Section 11.

51.     Plaintiff was provided with the Funds' Prospectuses and, similarly, prior to purchasing units of each of the Funds, all Class members likewise received the appropriate prospectus.  Plaintiff and other Class members purchased shares of the Funds traceable to the relevant false and misleading Prospectuses and were damaged thereby.

52.     As set forth herein, the statements contained in the Prospectuses, when they became effective, were materially false and misleading for a number of reasons, including that they failed to disclose that Canary and other select investors (the John Does named as defendants herein) were allowed to engage in timed trading so that the SSB Advisor Defendants could collect certain fees.  The Prospectuses failed to disclose and misrepresented, inter alia, the following material and adverse facts:

(a)     that, pursuant to that agreement, Canary regularly timed and late-traded the Funds shares;

(b)     that, contrary to the express representations in the Prospectuses, the Funds did not enforce their policy against frequent traders;

(c)     that the Advisor Defendants regularly allowed Canary to engage in trades that were disruptive to the efficient management of the Funds and/or increased the Funds' costs and thereby reduced the Funds' actual performance; and

(d)     the Prospectuses failed to disclose that, pursuant to the unlawful agreements, the Advisor Defendants, Canary Defendants and John Doe Defendants benefited financially at the expense of the Funds investors including plaintiff and the other members of the Class.

53.     At the time they purchased the Funds shares traceable to the defective Prospectuses, plaintiff and Class members were without knowledge of the facts concerning the false and misleading statements or omission alleged herein and could not reasonably have possessed such knowledge.  This claim was brought within the applicable statute of limitations.

### SECOND CLAIM FOR RELIEF

**Against SSB Advisor Defendants as Control Persons of the Funds
For Violations of Section 15 of the Securities Act**

54.     Plaintiff repeats and realleges each and every allegation contained above, except that for purposes of this claim, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional reckless misconduct and otherwise incorporates the allegations contained above.

55.     This Claim is brought pursuant to Section 15 of the Securities Act against the SSB Advisor Defendants as a control person of the Fund.  It is appropriate to treat these defendants as

a group for pleading purposes and to presume that the false, misleading, and incomplete

information conveyed in the Funds' public filings, press releases and other publications are the

collective actions of Defendants.

56.　　The Funds are liable under Section 11 of the Securities Act as set forth herein.

57.　　The SSB Advisor Defendants were "control persons" of the Funds within the

meaning of Section 15 of the Securities Act, by virtue of their position of operational control

and/or ownership.  At the time plaintiff and other members of the Class purchased shares of the

Funds -- by virtue of their positions of control and authority over the Funds – the SSB Advisor

Defendants directly and indirectly, had the power and authority, and exercised the same, to cause

the Funds to engage in the wrongful conduct complained of herein.  The SSB Advisor

Defendants issued, caused to be issued, and participated in the issuance of materially false and

misleading statements in the Prospectuses.

58.　　Pursuant to Section 15 of the Securities Act, by reason of the foregoing, the SSB

Defendants are liable to plaintiff and the other members of the Class for the Funds' primary

violations of Section 11 of the Securities Act.

59.　　By virtue of the foregoing, plaintiff and the other members of the Class are

entitled to damages against the SSB Advisor Defendants.

## VIOLATIONS OF THE EXCHANGE ACT

### THIRD CLAIM FOR RELIEF

**Violation Of Section 10(b) Of
The Exchange Act Against And Rule 10b-5
Promulgated Thereunder Against All Defendants**

60.　　Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein except for Claims brought pursuant to the Securities Act.

61.     During the Class Period, each of the defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including plaintiff and the other Class members, as alleged herein and cause plaintiff and other members of the Class to purchase the Funds shares or interests at distorted prices and otherwise suffered damages.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

62.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Funds' securities, including plaintiff and other members of the Class, in an effort to enrich themselves through undisclosed manipulative trading tactics by which they wrongfully appropriated the Funds' assets and otherwise distorted the pricing of their securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

63.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Funds' operations, as specified herein.

64.     These defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from secretly timed trading and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon plaintiff and members of the Class.

65.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

66.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of the Funds securities were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein.  In ignorance of these facts that market prices of the shares were distorted, and relying directly or indirectly on the false and misleading statements made by the Advisor Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired the shares or interests in the Funds during the Class Period at distorted prices and were damaged thereby.

67.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known of the truth concerning the Funds' operations, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their shares or, if they had acquired such shares or other interests during the Class Period, they would not have done so at the distorted prices which they paid.

68.     By virtue of the foregoing, defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and

the other members of the Class suffered damages in connection with their respective purchases

and sales of the Funds shares during the Class Period.

## VIOLATIONS OF THE INVESTMENT ADVISERS ACT

### FOURTH CLAIM FOR RELIEF

**For Violations of Section 206 of The Investment Advisers Act of 1940**
**[15 U.S.C. §80b-6 and 15 U.S.C. §80b-15]**

70.     Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

71.     This Count is based upon Section 215 of the Investment Advisers Act, 15 U.S.C.

§80b-15.

72.     SSB Advisor Defendants served as "investment adviser" to Plaintiff and other

members of the Class pursuant to the Investment Advisers Act.

73.     As a fiduciary pursuant to the Investment Advisers Act, the SSB Advisor

Defendants were required to serve Plaintiff and other members of the Class in a manner in

accordance with the federal fiduciary standards set forth in Section 206 of the Investment

Advisers Act, 15 U.S.C. §80b-6, governing the conduct of investment advisers.

74.     During the Class Period, the SSB Advisor Defendants breached their fiduciary

duties owed to Plaintiff and the other members of the Class by engaging in a deceptive

contrivance, scheme, practice and course of conduct pursuant to which they knowingly and/or

recklessly engaged in acts, transactions, practices and courses of business which operated as a

fraud upon plaintiff and other members of the Class.  As detailed above, SSB allowed the Canary

Defendants and John Doe Defendants to secretly engage in timing of the Funds shares.  The

purposes and effect of said scheme, practice and course of conduct was to enrich the Defendants,

at the expense of plaintiff and other members of the Class.

75.     The SSB Advisor Defendants breached their fiduciary duty owed to plaintiff and

the Class members by engaging in the aforesaid transactions, practices and courses of business

knowingly or recklessly so as to constitute a deceit and fraud upon plaintiff and the Class

members.

76.     The SSB Advisor Defendants are liable as direct participants in the wrongs

complained of herein because of their position of authority and control over the Funds were able

to and did: (1) control the content of the Prospectuses; and (2) control the operations of the

Funds.

77.     The SSB Advisor Defendants had a duty to (1) disseminate accurate and truthful

information with respect to the Funds; and (2) to truthfully and uniformly act in accordance with

its stated policies and fiduciary responsibilities to plaintiff and members of the Class. Defendants

participated in the wrongdoing complained of herein in order to prevent plaintiff and other

members of the Class from knowing of Defendants' breaches of fiduciary duties including: (1)

increasing its profitability at plaintiff's other members of the Class' expense by allowing Canary

and the John Doe Defendants to secretly time and late trade the Funds shares; and (2) placing its

interests ahead of the interests of plaintiff and other members of the Class.

78.     As a result of Defendants' multiple breaches of its fiduciary duties owed plaintiff

and other members of the Class, plaintiff and other Class members were damaged.

79.     Plaintiff and other Class members are entitled to rescind their investment advisory contracts with Defendants and recover all fees paid in connection with their enrollment pursuant to such agreements.

## FIFTH CLAIM FOR RELIEF

### For Violation of Section 206 of the Investment Advisers Act

80.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

81.     This claim is brought pursuant to Sections 206 and 215 of the Investment Advisers Act, 15 U.S.C. § 80b 6 and 15 U.S.C. § 80b 15, against the Adviser Defendants.

82.     Each of the SSB Adviser Defendants served as an "investment adviser" to Plaintiffs and other members of the Class pursuant to the 1940 Act.

83.     As a fiduciary pursuant to the 1940 Act, SSB Adviser Defendants were required to serve Plaintiffs and other members of the Class in a manner in accordance with the federal fiduciary standards set forth in Section 206 of the Investment Advisers Act, 15 U.S.C. § 80b 6, governing the conduct of investment advisers.  Section 206 provides that: "It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:

      (1)     to employ any device, scheme, or artifice to defraud any client or prospective client;

      (2)     to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

* * *

      (3)     to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. . . .

84.     The SSB Adviser Defendants offered advisory services for the Plaintiff and/or other members of the Class.

85.     During the Class Period, the SSB Adviser Defendants breached their fiduciary duties owed to plaintiffs and the other members of the Class by engaging in a deceptive contrivance, scheme, practice and course of conduct pursuant to which it knowingly and/or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud upon plaintiffs and other members of the Class.  As detailed above, the SSB Adviser Defendants allowed others to secretly engage in timed trading of the  Funds.  The purposes and effect of said scheme, practice and course of conduct was to enrich the SSB Adviser Defendants, among other defendants, at the expense of Plaintiffs and other members of the Class.

86.      The SSB Adviser Defendants breached their fiduciary duties owed to Plaintiffs and other Class members by engaging in the aforesaid transactions, practices and courses of business knowingly or recklessly so as to constitute a deceit and fraud upon Plaintiffs and the Class members.

87.     The SSB Adviser Defendants are liable as direct participants in the wrongs complained of herein.  The SSB Adviser Defendants, because of their position of authority and control over the  Funds were able to and did: (1) control the content of the Prospectuses; and (2) control the operations of the  Funds.

88.     Each of the SSB Adviser Defendants had a duty to (1) disseminate accurate and truthful information with respect to the  Funds; and (2) truthfully and uniformly act in accordance with its stated policies and fiduciary responsibilities to Plaintiffs and members of the Class.  The SSB Adviser Defendants participated in the wrongdoing complained of herein in order to prevent plaintiffs and other members of the Class from knowing of the Adviser

Defendants' breaches of fiduciary duties including: (1) increasing its profitability at Plaintiffs' and other members of the Class' expense by allowing others to secretly time their trading of the Funds' shares; and (2) placing their interests ahead of the interests of Plaintiffs and other members of the Class.

89.     As a result of the SSB Adviser Defendants' multiple breaches of their fiduciary duties owed plaintiffs and other members of the Class, Plaintiffs and other Class members were damaged.

90.     Plaintiffs and other Class members are entitled to rescind their investment advisory contracts with the SSB Adviser Defendants and recover all fees paid in connection with their enrollment pursuant to such agreements.

## SIXTH CLAIM FOR RELIEF

### For Violation of Section 34(b) of The Investment Company Act

91.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

92.     This claim is brought pursuant to Sections 34(b) of the Investment Company Act, 15 U.S.C. § 80a 33(b), against all the Defendants.

93.     Under Section 34(b) of the Investment Company Act, it is unlawful for any person to make any untrue statement of a material fact in any registration statement application, report, account, record, or other document filed or transmitted pursuant to this title or the keeping of which is required pursuant to section 31(a) [15 U.S.C. § 80a 30(a)]. It is also unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.

94.     The Defendants made untrue statements of a material fact in its registration statement, application, report, account, record, and/or other document filed or transmitted pursuant to this title, or the keeping of which is required pursuant to section 31(a) [15 U.S.C. § 80a 30(a)].

95.     Plaintiffs and other Class members have been injured as a result of the statements, conduct, and violations of the Defendants.

## SEVENTH CLAIM FOR RELIEF

### For Violation of Section 36(A) of the Investment Company Act

96.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

97.     This claim is brought pursuant to Section 36(a) of the Investment Company Act, 15 U.S.C. § 80a 35(a), against all defendants.

98.     Under Section 36(a), defendants are deemed to owe a fiduciary duty to Plaintiffs and other class members with respect to the receipt of fees and compensation that defendants receive for services of a material nature.  The purpose of the Act is to avoid discrimination among investors and protect the primary distribution system for mutual fund securities.  The Act restricts the transferability of mutual funds except in "conformity with the statements contained in the registration statements nor in contravention of such rules and regulations as the [Securities & Exchange] Commission may prescribe in the interests of the holders of all of the outstanding securities of such investment company."

99.     Defendants devised and implemented a scheme to obtain substantial fees and other income for themselves and their affiliates by allowing others to engage in timing [and/or late trading] of the  Funds throughout the Class Period, solely for their own benefit, in violation

of their fiduciary duties to their customers, i.e., Plaintiffs and other Class members.  Defendants

failed to reveal material facts concerning their conduct, such that Plaintiffs and other Class

members could have made informed decisions about the true value and performance of the

Funds.

100.     Plaintiffs and other Class members have been injured as a result of defendants'

statements, conduct, and violations.

## EIGHTH CLAIM FOR RELIEF

### Violation of Section 36(b) of The Investment Company Act

101.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as

though fully set forth hereafter.

102.     This claim is brought pursuant to Section 36(b) of the Investment Company Act,

15 U.S.C. § 80a 35(b), against all defendants.

103.     Under Section 36(b) of the Investment Company Act, defendants are deemed to

owe a fiduciary duty to Plaintiffs and other Class members with respect to the receipt of fees and

compensation that defendants receive for services of a material nature.

104.     Defendants devised and implemented a scheme to obtain substantial and

excessive fees and other income for themselves and their affiliates by allowing others to engage

in timing [and/or late trading] of the  Funds throughout the Class Period and in violation of their

fiduciary duties to their customers, i.e., Plaintiffs and other Class members.  Defendants failed to

reveal material facts concerning their conduct, such that Plaintiffs and other Class members

could have made informed decisions about the true value and performance of the  Funds.

105.     Plaintiffs and other Class members have been injured as a result of defendants'

statements, conduct, and excessive fees.

### NINTH CLAIM FOR RELIEF

#### For Violation of Section 48(a) of The Investment Company Act

106.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

107.     This claim is brought pursuant to Section 48(a) of the Investment Company Act, 15 U.S.C. §80a 47, against all defendants.

108.     Under Section 48(a) of the Investment Company Act, it is unlawful for any defendant to do indirectly that which, under the Act, it could not do directly.

109.     Defendants devised and implemented a scheme to obtain substantial fees and other income for themselves and their affiliates by allowing others to engage in timing [and/or late trading] of the  Funds throughout the Class Period and in violation of their fiduciary duties to their customers, i.e., Plaintiffs and other Class members.  Defendants failed to reveal material facts concerning their conduct, such that Plaintiffs and other Class members could have made informed decisions about the true value and performance of the  Funds.

110.     Plaintiffs and other Class members have been injured as a result of defendants' statements, conduct, and excessive fees.

111.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

112.     By virtue of Plaintiff's and the Class members' ownership of the Funds, the representations that defendants made in the Prospectuses about timing, and the obligations imposed by law as set forth in further detail in the SEC letters, defendants owed Plaintiffs and the Class members fiduciary duties of the highest good faith, integrity and fair dealing.

113.     Defendants and each of them breached their fiduciary duties by engaging in the acts and omissions detailed more fully above, including but not limited to, treating certain mutual

fund investors differently than other mutual fund investors; failing to follow their disclosed

policy and procedures of preventing market timing, affirmatively allowing certain investors to

engage in timing [and after market trading] in exchange for investing in defendants' funds; and

failing to disclose their true practices and procedures to Plaintiffs and the Class.

114.   Each of the Defendants knew that the other Defendants were breaching their

fiduciary duties to Plaintiffs and the Class.  Notwithstanding their knowledge, Defendants and

each of them, engaged in conduct, herein before described, which rendered substantial assistance

to, encouraged, and/or aided and abetted the breaches of duty.

115.   As a result of the wrongful conduct of defendants, Plaintiffs and the Class have

suffered and will continue to suffer economic losses and other general and specific damages, all

in an amount to be determined according to proof.

116.   The aforementioned acts of defendants, and each of them, were done maliciously,

oppressively, and with intent to defraud, and Plaintiffs and the Class are entitled to punitive and

exemplary damages in an amount to be shown according to proof at the time of trial.

## COMMON LAW CLAIMS

### TENTH CLAIM FOR RELIEF

### For Breach of Fiduciary Duty/Constructive Fraud

117.   Plaintiffs hereby incorporate by reference all of the allegations set forth above as

though fully set forth hereafter.

118.   This claim is brought against the all Defendants.

119.   The Defendants owed fiduciary duties to Plaintiffs and the Class to use reasonable

care and skill in operating, administering, issuing, underwriting, distributing and managing the

Funds.  As a part of their fiduciary duties to Plaintiffs the Class, the Defendants also owed a duty

to make a full and truthful disclosure of all material facts, to ensure that their representations

regarding market timing and late trading were complete and accurate, and to ensure that actions

were taken to protect long term holders of mutual fund shares in the Funds from damage caused

to their investments from market timing and late trading.

120.    Defendants breached their fiduciary duties by allowing favored investors to

conduct timed and/or late trading in the Funds, by misrepresenting and concealing the existence

of such market timing and late trading, and by placing their own financial interests above those

of Plaintiffs and members of the Class.

121.    Defendants' breaches of their fiduciary duties to Plaintiffs and the Class tended to

deceive, to violate public and private confidence and to injure public interests.

122.    Plaintiffs and members of the Class suffered injury as a result of the conduct of

Defendants in the form of, *inter alia*, the following:  increased transaction costs; requiring the

family of funds to keep excessive cash on hand to pay out timers' redemptions; lower NAV; and

management fees.

123.    The breaches of their fiduciary duties by Defendants proximately caused the

damages suffered by Plaintiff and the Class.

## ELEVENTH CLAIM FOR RELIEF

### For Aiding and Abetting Breach of Fiduciary Duty

124.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as

though fully set forth hereafter.

125.    This claim is brought against all Defendants.

126.     As alleged above, Defendants owed a fiduciary duty to Plaintiffs and members of the Class.  That duty was breached when those Defendants permitted favored investors to late trade and/or market time in the Funds.

127.     As a result of Defendants' breaches of fiduciary duty, Plaintiffs and members of the Class suffered damages.

## TWELVE CLAIM FOR RELIEF

### For Breach of Contract

128.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

129.     Defendants entered into a contract with Plaintiff and members of the Class as to the terms of the management of investments in certain of the Funds.  Defendants offered those terms to, *inter alia*, Plaintiffs and members of the Class, and Plaintiffs and members of the Class accepted.

130.     The terms of that contract are manifested in the form of, among other things, the Prospectuses identified herein.

131.     Plaintiffs and members of the Class performed under the contract by investing in the Funds.

132.     In exchange for valuable consideration in the form of Plaintiffs' and members of the Class' investments and payment of management fees, Defendants covenanted to protect Plaintiffs and members of the Class from the negative effects of market timing and late trading.

133.     As set forth above, Defendants breached these covenants when they permitted favored investors to engage in market timing and/or late trading at the expense of Plaintiffs and the Class.

134.    The breach by Defendants caused Plaintiffs and members of the Class to suffer damages.

## THIRTEENTH CLAIM FOR RELIEF

### For Unjust Enrichment

135.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

136.    Plaintiffs and members of the Class conferred a benefit on the Defendants. Defendants derived management fees and other benefits and were otherwise unjustly enriched from transactions connected with the Funds, to the detriment of Plaintiffs and members of the Class.

137.    Defendants' enrichment is directly and causally related to the detriment of Plaintiffs and members of the Class.

138.    The benefit was accepted by Defendants under such circumstances that it would be inequitable for it to be retained without payment.  As alleged above, Defendants, *inter alia*, breached their fiduciary duties to Plaintiffs and members of the Class and breached contracts with Plaintiffs and members of the Class, and therefore Defendants are not justified to retain the benefits conferred upon them.

139.    As a result of all of the Defendants' conduct, Plaintiffs and members of the Class suffered damages.

140.    There is no adequate remedy at law to compensate for the injuries of Plaintiffs and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

       a.      Determining that this action is a proper class action and appointing plaintiff as Lead Plaintiff and her counsel as Lead Counsel for the Class and certifying her as class representative under Rule 23 of the Federal Rules of Civil Procedure;

       b.      Awarding compensatory damages in favor of plaintiff and other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

       c.      Awarding plaintiff and other members of the Class rescission of their contracts with Defendants, including recovery of all fees which would otherwise apply, and recovery of all fees paid to Defendants pursuant to such agreements;

       d.      Causing the Defendants to account for wrongfully gotten gains, profits and compensation and to make restitution of same and disgorge them;

       e.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

       f.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  August 9, 2004

                                   **TYDINGS & ROSENBERG LLP**

                                   By: _____
                                   John B. Isbister
                                   100 East Pratt Street
                                   Baltimore, Maryland 21202

Telephone: 410-752-9700
Fax: 410-727-5460

**GOODKIND LABATON RUDOFF &
    SUCHAROW, LLP**
Joel H. Bernstein, Esq.
Lawrence A. Sucharow
Beth Hoffman
100 Park Avenue
New York, New York 10017
Tel: (212) 907-0700
Fax: (212) 818-0477

**DEUTSCH & LIPNER**
Seth E. Lipner
1325 Franklin Avenue, Suite 225
Garden City, New York  11530
(516) 294-8899
(516) 742-9416 (fax)

***Attorneys for Plaintiff***

## EXHIBIT A

The term "Funds" as used herein includes, but is not limited to the Salomon Brothers and Smith Barney Funds listed below:

| FUND | CLASS A | CLASS B | CLASS L | CLASS O | CLASS Y | CLASS 2 |
|------|---------|---------|---------|---------|---------|---------|
| Salomon Brothers All Cap Value Fund | SUBAX | SUBBX | n/a | n/a | n/a | SUBZX |
| Salomon Brothers Balanced Fund | STRAX | STRBX | n/a | n/a | n/a | STRCX |
| Salomon Brothers California Tax Free Bond Fund | CCAIX | SCUBX | n/a | n/a | n/a | SCULX |
| Salomon Brothers Capital Fund | SCCAX | SPABX | n/a | SACPX | n/a | SCCCX |
| Salomon Brothers High Yield Bond | SAHYX | SBHYX | n/a | SHYOX | n/a | SHYCX |
| Salomon Brothers International Equity Fund | SAIEX | SAIBX | n/a | n/a | n/a | SAICX |
| Salomon Brothers Investors Value Fund | SINAX | SBINX | n/a | SAIFX | n/a | SINOX |
| Salomon Brothers Large Cap Growth Fund | SLCAX | SALBX | n/a | n/a | n/a | SALCX |
| Salomon Brothers Mid Cap Fund | SMDAX | SMDBX | n/a | n/a | n/a | SMDZX |
| Salomon Brothers National Tax Free Bond Fund | CFNIX | SNABX | n/a | n/a | n/a | SNALX |
| Salomon Brothers New York Tax Free Bond Fund | CFTNX | SNFBX | n/a | n/a | n/a | SNFLX |
| Salomon Brothers SB Adjustable Rate Income Fund | SJRAX | SJRBX | n/a | n/a | n/a | SJRZX |
| Salomon Brothers SB Capital and Income Fund | SOLAX | SOLBX | n/a | n/a | n/a | SOLZX |
| Salomon Brothers SB Convertible Fund | SVEAX | SVEBX | n/a | n/a | n/a | SCEZX |
| Salomon Brothers SB Growth & Income Fund | SSWAX | SSWBX | n/a | n/a | n/a | SSWZX |
| Salomon Brothers Short/Intermediate U.S. Government Fund | SUSAX | SUSBX | n/a | n/a | n/a | SUSCX |
| Salomon Brothers Small Cap Growth | SASMX | SBSMX | n/a | n/a | n/a | SCSMX |
| Salomon Brothers Strategic Bond Fund | SSTAX | SBSBX | n/a | n/a | n/a | SSTCX |

| | | | | | |
|---|---|---|---|---|---|
| Smith Barney Aggressive Growth Fund | SHRAX | SAGBX | SAGCX | n/a | n/a | n/a |
| Smith Barney All Cap Growth and Value Fund | SPAAX | SPBBX | SPBLX | n/a | n/a | n/a |
| Smith Barney Appreciation Fund | SHAPX | SAPBX | SAPCX | n/a | SAPYX | n/a |
| Smith Barney Arizona Municipals Fund | SLAZX | SAZBX | SAZLX | n/a | n/a | n/a |
| Smith Barney Balanced Portfolio | SBBAX | SCBBX | SCBCX | n/a | n/a | n/a |
| Smith Barney California Municipals Fund | SHRCX | SCABX | SCACX | n/a | n/a | n/a |
| Smith Barney Classic Values Fund | SCLAX | SCLBX | SCLLX | n/a | n/a | n/a |
| Smith Barney Conservative Portfolio | SBCPX | SBCBX | SBCLX | n/a | n/a | n/a |
| Smith Barney Diversified Large Cap Growth Fund | CFLGX | CLCBX | SMDLX | n/a | n/a | n/a |
| Smith Barney Diversified Strategic Income Fund | SDSAX | SLDSX | SDSIX | n/a | n/a | n/a |
| Smith Barney Dividend and Income Fund | SUTAX | SLSUX | SBBLX | n/a | n/a | n/a |
| Smith Barney Financial Services Fund | SBFAX | SBFBX | SFSLX | n/a | n/a | n/a |
| Smith Barney Florida Portfolio | SBFLX | FLABX | SFLLX | n/a | n/a | n/a |
| Smith Barney Fundamental Value Fund | SHFVX | SFVBX | SFVCX | n/a | n/a | n/a |
| Smith Barney Georgia Portfolio | SBGAX | SBRBX | SGALX | n/a | n/a | n/a |
| Smith Barney Global All Cap Growth and Value Fund | SPGAX | SPGGX | SPGLX | n/a | n/a | n/a |
| Smith Barney Global Government Bond Portfolio | SBGLX | SBGBX | SGGLX | n/a | n/a | n/a |
| Smith Barney Global Portfolio | CAGAX | CAGBX | SGPLX | n/a | n/a | n/a |
| Smith Barney Government Securities Fund | SGVAX | HGVSX | SGSLX | n/a | n/a | n/a |
| Smith Barney Group Spectrum Fund | SGSAX | SGSBX | SFTLX | n/a | n/a | n/a |
| Smith Barney Growth Portfolio | SCGRX | SGRBX | SCGCX | n/a | n/a | n/a |
| Smith Barney Hansberger Global Value Fund | SGLAX | SGLBX | SGLCX | n/a | n/a | n/a |
| Smith Barney Health Sciences Fund | SBIAX | SBHBX | SBHLX | n/a | n/a | n/a |

| | | | | | | |
|---|---|---|---|---|---|---|
| Smith Barney High Growth Portfolio | SCHAX | SCHBX | SCHCX | n/a | n/a | n/a |
| Smith Barney High Income Fund | SHIAX | SHIBX | SHICX | n/a | n/a | n/a |
| Smith Barney Income Portfolio | SCAAX | SCIAX | SCILX | n/a | n/a | n/a |
| Smith Barney Intermediate Maturity CA Municipals Fund | ITCAX | STDBX | SIMLX | n/a | n/a | n/a |
| Smith Barney Intermediate Maturity NY Municipals Fund | IMNYX | SNMBX | SINLX | n/a | n/a | n/a |
| Smith Barney International All Cap Growth Portfolio | SBIEX | SBIBX | SBICX | n/a | n/a | n/a |
| Smith Barney International Large Cap Fund | CFIPX | SILCX | SILLX | n/a | n/a | n/a |
| Smith Barney Investment Grade Bond Fund | SIGAX | HBDIX | SBILX | n/a | n/a | n/a |
| Smith Barney Large Cap Core Fund | GROAX | GROBX | SCPLX | n/a | n/a | n/a |
| Smith Barney Large Cap Growth and Value Fund | SPSAX | SPSBX | SPSLX | n/a | n/a | n/a |
| Smith Barney Large Cap Value Fund | SBCIX | SBCCX | SBGCX | n/a | n/a | n/a |
| Smith Barney Large Capitalization Growth Fund | SBLGX | SBLBX | SLCCX | n/a | SBLYX | n/a |
| Smith Barney Limited Term Portfolio | SBLTX | STMBX | SMLLX | n/a | n/a | n/a |
| Smith Barney Managed Governments Fund | SHMGX | MGVBX | SMGLX | n/a | n/a | n/a |
| Smith Barney Managed Municipals Fund | SHMMX | SMMBX | SMMCX | n/a | n/a | n/a |
| Smith Barney Massachusetts Municipals Fund | SLMMX | SMABX | SMALX | n/a | n/a | n/a |
| Smith Barney Mid Cap Core Fund | SBMAX | SBMDX | SBMLX | n/a | SMBYX | n/a |
| Smith Barney Municipal High Income Fund | STXAX | SXMTX | SMHLX | n/a | n/a | n/a |
| Smith Barney National Portfolio | SBBNX | SBNBX | SBNLX | n/a | n/a | n/a |
| Smith Barney  New Jersey Municipals Fund | SHNJX | SNJBX | SNKLX | n/a | n/a | n/a |
| Smith Barney New York Portfolio | SBNYX | SMNBX | SBYLX | n/a | n/a | n/a |
| Smith Barney Oregon Municipals Fund | SHORX | SORBX | SORLX | n/a | n/a | n/a |

| | | | | | |
|---|---|---|---|---|---|
| Smith Barney Pennsylvania Portfolio | SBPAX | SBPBX | SPALX | n/a | n/a | n/a |
| Smith Barney S & P 500 Index Fund | SBSPX | n/a | n/a | n/a | n/a | n/a |
| Smith Barney SB Adjustable Rate Income Fund | ARMZK | ARMBX | ARMGX | n/a | n/a | n/a |
| Smith Barney SB Capital and Income Fund | SOPAX | SOPTX | SBPLX | n/a | n/a | n/a |
| Smith Barney SB Convertible Fund | SCRAX | SCVSX | SMCLX | n/a | SCVYX | n/a |
| Smith Barney SB Growth & Income Fund | GRIAX | GRIBX | SGAIX | n/a | n/a | n/a |
| Smith Barney Short Duration Municipal Income Fund | SHDAX | SHDBX | SHDLX | n/a | n/a | n/a |
| Smith Barney Short-Term Investment Grade Bond Fund | SBSTX | SHBBX | SSTLX | n/a | n/a | n/a |
| Smith Barney Small Cap Core Fund | SBDSX | SBDBX | SBDLX | n/a | n/a | n/a |
| Smith Barney Small Cap Growth Fund | SBSGX | SBYBX | SBSLX | n/a | n/a | n/a |
| Smith Barney Small Cap Growth Opportunities Fund | CFSGX | SMOBX | SGOLX | n/a | n/a | n/a |
| Smith Barney Small Cap Value Fund | SBVAX | SBVBX | SBVLX | n/a | n/a | n/a |
| Smith Barney Social Awareness Fund | SSIAX | SESIX | SESLX | n/a | n/a | n/a |
| Smith Barney Technology Fund | SBTAX | SBTBX | SBQLX | n/a | n/a | n/a |
| Smith Barney Total Return Bond Fund | TRBAX | TRBBX | SBTLX | n/a | n/a | n/a |
| Smith Barney U.S. Government Securities Fund | SBCGX | SBUBX | SBULX | n/a | n/a | n/a |

## CERTIFICATION

I, Kathleen Fitzgerald, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification.  I have reviewed a complaint prepared against Smith Barney mutual funds ("Smith Barney Funds") alleging violations of the federal securities laws and I authorized the filing of this complaint;

2.      I did not purchase securities of Smith Barney Funds at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      I am willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.      I have transactions in the securities of Smith Barney Funds as reflected in Exhibit A hereto;

5.      I have not served as a lead plaintiff in any class action under the federal securities laws during the last three years, except for the following:

*Fitzgerald v. Citigroup Inc.*, # 03-Civ-4305 (DAB) (S.D.N.Y.)

6.      Beyond my pro rata share of any recovery, I will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Dated: _9 August 04_

_K. A. F. b Gerald._
Kathleen Fitzgerald

## EXHIBIT A

## TRANSACTIONS IN
## SMITH BARNEY MUTUAL FUNDS

| Fund Name | Transaction | Date | No. of Shares | Cost/Proceeds |
|---|---|---|---|---|
| Smith Barney High Income Fund | Purchase | 7/20/00 | 13,034.411 | $125,000.00 |
| | | | | |
| Smith Barney Aggressive Growth Fund B | Purchase | 7/20/00 | 138.471 | $13,772.30 |
| Smith Barney Aggressive Growth Fund B | Sale | 12/27/02 | 1.000 | $57.77 |
| | | | | |
| Smith Barney Diversified Strategic Income Fund | Purchase | 7/20/00 | 37,826.685 | $275,000.00 |
| Smith Barney Diversified Strategic Income Fund | Sale | 7/25/03 | 25,000.000 | $167,000.00 |